E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
IAN V. YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
Deputy Chief, General Crimes Section
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorney
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3667 / 0813
    Facsimile: (213) 894-0141
    E-mail:   ian.yanniello@usdoj.gov
            daniel.weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-000222-FLA |
|---|---|
|     Plaintiff, | TRIAL MEMORANDUM |
|        v. | Trial Date:  February 21, 2023 |
| ALEXANDER DECLAN BELL WILSON, | Trial Time:  8:30 a.m.<br>Location:   Courtroom of the |
|     Defendant. |            Hon. Fernando<br>           Aenlle-Rocha |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Ian V. Yanniello and Daniel H. Weiner, hereby files its Trial Memorandum.

//

//

This Trial Memorandum is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 3, 2023          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _____/s/_____

                                 IAN V. YANNIELLO
                                 DANIEL H. WEINER
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

# Table of Contents

TRIAL MEMORANDUM.............................................................1

I.   STATUS OF THE CASE.....................................................1

II.  ELEMENTS OF THE OFFENSE................................................1

     A.   Distribution of Fentanyl Resulting in Death...................1

III. THE GOVERNMENT'S CASE..................................................2

     A.   Defendant Distributed Fentanyl To N.Y., And N.Y. Died
          From Taking The Fentanyl......................................2

          1.   Defendant Distributed Fentanyl-Containing Pills
               To N.Y...................................................2

          2.   N.Y. Ingested The Five Fentanyl-Containing Pills.....3

          3.   Defendant Admits His Friends Got High From
               Defendant's Pills, And Makes Fun Of The Victim
               For Chewing The Pills....................................4

          4.   N.Y. Dies of a Fentanyl Overdose.....................5

          5.   N.Y.'s Grandmother Finds N.Y. Dead in Bed...........5

          6.   The Autopsy And Forensic Toxicology Report
               Confirm N.Y. Died From A Fentanyl Overdose...........5

          7.   Defendant Is Arrested And Lies To Law Enforcement
               About Dealing Drugs......................................6

     B.   Witnesses in the Government's Case-in-Chief..............7

IV.  LEGAL AND EVIDENTIARY ISSUES...................................8

     A.   Digital Communications....................................8

          1.   Authentication Of Snapchat Data And Defendant's
               Custodial Interview.....................................8

          2.   Digital Device Evidence.............................8

          3.   911 Call............................................8

     B.   Physical Evidence.........................................9

     C.   Summary Charts Regarding Digital Evidence................9

     D.   Expert Testimony.........................................10

     E.   Lay Law Enforcement Testimony............................11

F.   Defendant's Statements..................................12

G.   Defendant's State Court Matter..........................12

H.   Cross-Examination of Defendant..........................13

I.   Use of Exhibits During Opening Statement................14

J.   Defendant Seeking to Call Jose Arambula as a Defense
     Witness.................................................14

K.   Reciprocal Discovery....................................18

L.   Affirmative Defenses....................................18

V.   CONCLUSION..................................................19

**Table of Authorities**

**Cases**                                                                    **Page**

Federal Cases

Burrage v. United States, 571 U.S. 204 (2014).........................2

Taylor v. Illinois, 484 U.S. 400 (1988)...........................13

United States v. Anekwu, 695 F.3d 967 (9th Cir. 2012)..............7

United States v. Antonakeas, 255 F.3d 714 (9th Cir. 2001)..........12

United States v. Barragan, 871 F.3d 689 (9th Cir. 2017)............9

United States v. Boulware, 470 F.3d 931 (9th Cir. 2006)............7

United States v. Castillo, 181 F.3d 1129 (9th Cir. 1999)..........11

United States v. David, 337 F. App'x 639 (9th Cir. 2009)..........12

United States v. De Peri, 77826 F.2d 963 (3d Cir. 1985)...........12

United States v. Fernandez, 839 F.2d 639 (9th Cir. 1988)..........10

United States v. Fleischman, 684 F.2d 1329 (9th Cir. 1982)..........8

United States v. Freeman, 498 F.3d 893 (9th Cir. 2007)..............9

United States v. Houston, 406 F.3d 1121 (9th Cir. 2005)............2

United States v. Moreno, 243 F.3d 551 (9th Cir. 2000)..............9

United States v. Pino-Noriega, 189 F.3d 1089 (9th Cir. 1999).......9

United States v. Rubino, 431 F.2d 284 (6th Cir. 1970).............12

United States v. Skeet, 665 F.2d 983 (9th Cir. 1982)...............9

United States v. VonWillie, 59 F.3d 922 (9th Cir. 1995)............9

United States v. Weicks, 362 F. App'x 844 (9th Cir. 2010).........12

United States v. Wood, 943 F.2d 1048 (9th Cir. 1991)...............7

Zal v. Steppe, 968 F.2d 924 (9th Cir. 1992).......................13

Federal Statutes and Rules

Fed. R. Crim. P. 16(d)(2)............................................13

Fed. R. Crim. Pro. 16(a)(1)(G)......................................8

Fed. R. Evid. 702...................................................8

Fed. R. Evid. 801(c)...............................................10

Fed. R. Evid. 801(d)(2)............................................10

Fed. R. of Evid. 607...............................................11

Fed. R. of Evid. 611(a).............................................7

Fed. R. of Evid. 701................................................9

1

## TRIAL MEMORANDUM

2

## I.  STATUS OF THE CASE

3   Defendant Alexander Declan Bell Wilson ("defendant") is charged

4   in a one-count indictment with distribution of fentanyl resulting in

5   the death of a 15-year-old boy named N.Y., in violation of 21 U.S.C.

6   §§ 841(a)(1), (b)(1)(C).  Defendant has pleaded not guilty to the

7   charge and will proceed to trial on February 21, 2023 at 8:30 a.m.

8   Defendant filed two pretrial motions that have since been resolved by

9   the agreement of the parties.

10  ## II.  ELEMENTS OF THE OFFENSE

11      ### A.  Distribution of Fentanyl Resulting in Death

12      The elements of distribution of fentanyl as charged in Count One

13  are (1) the defendant knowingly distributed any controlled substance,

14  which was in fact fentanyl; and (2) the defendant knew that it was

15  some kind of a federally controlled substance.  See 21 U.S.C.

16  §§ 841(a)(1), (b)(1)(C); Ninth Circuit Model Criminal Jury Inst. No.

17  12.4 (2022 ed.); United States v. Collazo, 984 F.3d 1308, 1329 (9th

18  Cir. 2021) (en banc) (government need not prove a defendant's

19  knowledge of drug type or quantity to secure a conviction under 21

20  U.S.C. § 841(a)).

21      "Distributing" means delivering or transferring possession of a

22  controlled substance to another person, with or without any financial

23  interest in that transaction.  See Ninth Circuit Model Criminal Jury

24  Inst. No. 12.4 (2022 ed.).

25      For the sentencing enhancement charged in Count One, the

26  government must prove that death resulted from the use of such

27  controlled substance.  See Burrage v. United States, 571 U.S. 204,

28

214, 218-19 (2014); <u>United States v. Houston</u>, 406 F.3d 1121, 1124-5 (9th Cir. 2005).

## III. THE GOVERNMENT'S CASE

### A. Defendant Distributed Fentanyl To N.Y., And N.Y. Died From Taking The Fentanyl

The government will present evidence that, on or about May 14, 2020, defendant distributed fentanyl to N.Y. and that N.Y.'s death on May 15, 2020 resulted from the use of the fentanyl.  At trial, the government intends to prove the following:

### 1. Defendant Distributed Fentanyl-Containing Pills To N.Y.

On the evening of May 14, 2020, N.Y. and his 13-year-old brother J.N. played video games in their shared bedroom.  At some point that night, defendant agreed to distribute five "percs" --- slang for Percocet pills --- to N.Y., which N.Y. likely believed were authentic pharmaceutical pills that contained oxycodone.[1]  At around 11:30 p.m., J.N. met defendant outside of the family's house to pick up the five pills.  Defendant then handed a plastic bag containing five pills to J.N. through the window of defendant's vehicle.  J.N. took the bag from defendant, went back inside the house, and gave the pills to N.Y.

//

//

---

[1] There is no record of the initial communication between defendant and N.Y. setting up the transaction.

Shortly thereafter, at approximately 11:54 pm, N.Y. posted the following photograph depicting five pills on his Snapchat account:



        2.   N.Y. Ingested The Five Fentanyl-Containing Pills

After defendant's delivery, N.Y. began taking defendant's pills.  Specifically, the government will introduce Snapchat[2] conversations between N.Y. and defendant from the early hours of May 15 showing that N.Y. told defendant he chewed and ingested defendant's pills, though when N.Y. actually consumed the pills is unknown.  As noted below, defendant and N.Y. exchanged Snapchat communications throughout the night until N.Y. sent the last text of his life at approximately 5:50 a.m.

The government also expects to introduce Snapchat messages between N.Y. and another drug dealer named Jose Arambula from May 14

---

    [2] Snapchat is a social media platform that allows users to send direct text messages to other Snapchat users and post video or image content as "stories" that are accessible to the user's friends.

1  and 15, 2020.  These messages will show that N.Y. attempted to buy

2  oxycodone from Arambula on May 15, but the evidence will show that

3  the transaction was never completed.[3]

4          3.   <u>Defendant Admits His Friends Got High From Defendant's
                Pills, And Makes Fun Of The Victim For Chewing The
5                Pills</u>

6          Defendant and N.Y.'s Snapchat conversation will show that

7  defendant argued with N.Y. about how to consume the pills the

8  defendant sold.  Specifically, defendant chastised N.Y. for chewing

9  (instead of snorting) defendant's pills.  Specifically, from

10  approximately 1:50 a.m. to 5:00 a.m. on May 15, defendant and N.Y.

11  argued about the proper way to consume defendant's pills.  During the

12  conversation, defendant admitted that his friends "that do that shit

13  all the time that we're [sic] in the car" when defendant delivered

14  the drugs to N.Y. "were fucked up and even they know your not

15  supposed to chew them."

16          Defendant also admitted that he distributed the pills to N.Y.:

17  "why are you fuckin refusing to fuckin admit that you thought the

18  ones I gave you were capsule when you literally showed me a picture

19  of what they looked like and when the ones I gave you were fuckin

20  powdered."  (Emphasis added).

21          Throughout the evening, defendant took screenshots of his

22  conversation with N.Y., imposed text over the screenshot making fun

23  of N.Y. for chewing the pills, and shared these screenshots with his

24  Snapchat followers.

25

26

---

27          [3] The parties have met and conferred about the trial memorandum.
    The defense objects to the government's characterization that the
28  evidence will show that no transaction occurred between the victim
    and Arambula.  The defense contends otherwise.

####        4.   N.Y. Dies of a Fentanyl Overdose

Defendant and N.Y.'s Snapchat conversation will show that N.Y. began to feel the effects of defendant's pills at least as early as 3:21 a.m. on May 15.  In response to defendant's statement that "You deadass wasted $100 for not takin them right," N.Y. responded: "They worked."  Defendant then responded: "shut the fuck up then whyd you say you barely felt them [emoji of crying face]...."

At approximately 5:12 a.m., N.Y.'s Snapchat communications show his imminent death.  He tells defendant "Hol up this shi. Hard to read rn"; that "Ho up typing is hard"; and that "Im seein double." Defendant responds: "Aint my problem you dumb af."

N.Y.'s final message on Snapchat was approximately forty minutes later at 5:50 a.m.

####        5.   N.Y.'s Grandmother Finds N.Y. Dead in Bed

At approximately 10:30 a.m. on May 15, N.Y.'s grandmother Candace Young went into N.Y.'s bedroom to wake up J.N. and N.Y.  When she tried to wake up N.Y., she immediately realized that he was dead: N.Y. was blue and not breathing.

Candace called 911 and LA County first responders were dispatched to the Young-Nichols' house.  After a failed attempt at CPR, first responders transported N.Y. to the hospital where he was pronounced dead.

####        6.   The Autopsy And Forensic Toxicology Report Confirm N.Y. Died From A Fentanyl Overdose

On May 20, 2020, Dr. Odey C. Ukpo of the LA County Department of Medical Examiner-Coroner performed an autopsy on N.Y.'s body.  The autopsy confirmed that N.Y.'s cause of death was due to mixed drug toxicity of fentanyl and methylenedioxyamphetamine (MDMA).  LA County

forensic analysts then conducted a blood analysis that confirmed that N.Y.'s blood contained 55 ng/mL of fentanyl, 0.07 mcg/mL of methylenedioxyamphetamine (MDA), 0.89 mcg/mL of methylenedioxymethamphetamine (MDMA), and 0.007 g% isopropanol.

At trial, the government intends to introduce the expert testimony of Dr. Shaun Carstairs, who will testify that it is his opinion to a reasonable degree of medical probability that N.Y.'s death was due to a fentanyl overdose.  Dr. Carstairs is also expected to testify that, but for the presence of fentanyl, death due to the other substances measured in N.Y. was unlikely.  Specifically, Dr. Carstairs is expected to testify that it is unlikely that the levels of MDMA/MDA and trace amount of isopropanol seen in N.Y.'s blood would result in death.  Dr. Carstairs is also expected to testify regarding the delayed onset of fentanyl in the body after chewing (compared to snorting or injecting) fentanyl-containing pills.

### 7. Defendant Is Arrested And Lies To Law Enforcement About Dealing Drugs

After a joint investigation by the LA County Sheriff's Department and the Drug Enforcement Administration, defendant was indicted and arrested for distributing fentanyl that resulted in N.Y.'s death.

During a custodial interview with law enforcement, defendant waived his Miranda rights and voluntarily spoke.  At trial, the government expects to introduce audio clips from defendant's interview that demonstrate: (i) his admission that he facilitated the drug transaction to N.Y.; and (ii) his consciousness of guilt. For example, when law enforcement asked defendant if he knew "what we're here to talk to you about," defendant stated "I have a

feeling."  When law enforcement confirmed that "we're talking about a kid named [N.Y.]," defendant admitted "Mm hm.  Then yeah, I know exactly what you're talking about."

### B.   Witnesses in the Government's Case-in-Chief

The government anticipates calling the following witnesses in its case-in-chief:

- Captain Matthew Levesque, Los Angeles County Fire Engine 106 (anticipated testimony of approximately 20 minutes)[4]

- Karl Young (approximately 45 minutes)

- J.N. (approximately 1.5 hours)

- H.W. (approximately 45 minutes)

- Dr. Odey C. Ukpo (approximately 50 minutes)

- Sarah Buxton de Quintana (approximately 30 minutes)

- Dr. Shaun Carstairs (approximately 3 hours)

- DEA SA Robert Thomas (approximately 4 hours)

- Snapchat employee to be named before trial (approximately 45 minutes)

- Nathan Lind, Forensic Drug Analyst (approximately 45 minutes)[5]

While the length of defendant's cross-examinations are difficult to predict, the government expects that its case-in-chief can be completed in two to three days.  Should defendant offer witnesses or present evidence in his defense, the government may choose to call additional witnesses in rebuttal.

---

[4] Consistent with the Court's standing order, the parties have met and conferred about the anticipated length of each witness's direct and cross examination.

[5] The government expects that the parties will stipulate to drug testing completed in this case, and thus may not call this witness at trial.

The government does not anticipate that any government witness will require the assistance of an interpreter.

## IV.   LEGAL AND EVIDENTIARY ISSUES

### A.   Digital Communications

#### 1.   Authentication Of Snapchat Data And Defendant's Custodial Interview

The government intends to introduce digital communications from Snapchat, including: (i) text and screenshots from defendant and N.Y.'s May 14 and 15 conversation and (ii) audio and video clips from defendant's Snapchat account.  The government expects that the parties will stipulate to the authenticity and admissibility of these digital communications.  The government has identified the communications that it seeks to introduce on its exhibit list, but it reserves the right to seek admission of additional statements before or during the course of the trial.

These digital communications are in English, and the government expects to display transcriptions on a screen simultaneous with the playing of any audio and video.

#### 2.   Digital Device Evidence

The government will seek to introduce material seized from the defendant's and victim's cellular phones, including call logs.  The government expects that the parties will stipulate to the authenticity of evidence seized from the devices.

#### 3.   911 Call

The government will seek to introduce excerpts from Candace Young's 911 call on May 15, 2020 which she placed immediately after finding N.Y. "cold", "blue", and in a condition she described as "dead."  The 911 call is admissible as an excited utterances because

it relates "to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803 (2).  Moreover, because the call was made for the purpose of getting help during an ongoing emergency, the 911 call is not testimonial and its admission does not violate the Confrontation Clause.  See Davis v. Washington, 547 U.S. 813, 823, 827-28 (2006) (holding that statements by a domestic abuse victim to a 911 operator are nontestimonial when made during an ongoing emergency); Rojas v. Kirkland, 472 F. App'x 668, 669 (9th Cir. 2012); United States v. Polidore, 690 F.3d 705, 711-12 (5th Cir. 2012).

**B.   Physical Evidence**

The government does not intend to introduce any physical evidence during trial.

**C.   Summary Charts Regarding Digital Evidence**

The Ninth Circuit has long endorsed the use of summary charts as a "testimonial aid" for the jury.  United States v. Wood, 943 F.2d 1048, 1053-54 (9th Cir. 1991).  It has also acknowledged that there is no "bright-line rule against admission of summary charts as evidence."  United States v. Anekwu, 695 F.3d 967, 981-82 (9th Cir. 2012).  Rather, it is within a "district court's discretion" under Federal Rule of Evidence 611(a) to determine whether such exhibits can be admitted.  Id. at 982 (citing United States v. Boulware, 470 F.3d 931, 936 (9th Cir. 2006)).

The government plans to move into evidence various summary charts, including summaries of N.Y. and defendant's May 14 and 15 communications and a timeline showing relevant communications.  These charts will aid the jury is understanding this important evidence.

### D.   Expert Testimony

A qualified expert witness may provide opinion testimony on the issue in question if specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue. See Fed. R. Evid. 702.  To be admissible, expert testimony must satisfy only two basic requirements: (1) the testimony must be helpful to the trier of fact; and (2) the witness must be qualified to deliver the testimony based on his knowledge, skill, experience, training, or education.  Id.  An expert may provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact.  See United States v. Fleischman, 684 F.2d 1329, 1335 (9th Cir. 1982).

Each of the government's expert witnesses meets the requirements of Rule 702.  The government has notified defendant pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) that it intends to call as expert witnesses: (i) a medical examiner, (ii) an emergency medicine and medical toxicology expert, (iii) forensic analysts, (iv) and a law enforcement drug expert.  However, the government expects the parties will enter into factual stipulations to obviate the need to call the forensic analysts to testify about drug testing and the process for extracting cellular phone data.  The anticipated stipulation is expected to cover: (i) N.Y.'s blood analysis; (ii) analysis of an alprazolam tablet found in N.Y.'s bed after his death; and (iii) the examination and extraction of the contents of N.Y.'s and defendant's cell phones.

To date, defendant has not challenged any of the government's experts' qualifications or the helpfulness of their testimony.

### E.    Lay Law Enforcement Testimony

The government anticipates calling a law enforcement officer as lay witness who may give opinion testimony.  Federal Rule of Evidence 701 "permits a lay witness to give opinion testimony as long as the opinion is (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."  United States v. Pino-Noriega, 189 F.3d 1089, 1097 (9th Cir. 1999) (cleaned up).  Lay opinion testimony by law enforcement officers is admissible and is not necessarily expert testimony within the meaning of Rule 16(a)(1)(G).  See United States v. VonWillie, 59 F.3d 922, 929 (9th Cir. 1995); see also United States v. Barragan, 871 F.3d 689, 703-04 (9th Cir. 2017). As the Ninth Circuit has explained, law enforcement officers' opinion testimony:

> is a means of conveying to the [jury] what the witness has seen or heard . . . . Because it is sometimes difficult to describe the mental or physical condition of a person, his character or reputation, the emotions manifest by his acts; speed of a moving object or other things that arise in a day to day observation of lay witnesses; things that are of common occurrence and observation, such as size, heights, odors, flavors, color, heat, and so on; witnesses may relate their opinions or conclusions of what they observed.

United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982); United States v. Freeman, 498 F.3d 893, 904-05 (9th Cir. 2007) (upholding, as proper lay testimony, detective's testimony interpreting ambiguous statements where his "understanding of ambiguous phrases was based on his direct perception of several hours of intercepted conversations. . . and other facts he learned during the investigation" and his testimony "proved helpful to the jury in determining what [defendants] were communicating during the recorded telephone calls").  Rule 16 notice is not required for lay witnesses.  United

States v. Moreno, 243 F.3d 551, 551 (9th Cir. 2000) ("Rule 16 notice was not required, however, because this testimony was properly admitted as the opinion of a lay witness.").

**F.    Defendant's Statements**

While the government may use the statements of a defendant against him under Rule 801(d)(2), that Rule may not be relied upon by the defendant because he is not the proponent of the evidence and the evidence is not being offered against him (but rather on his behalf). This is because defendant's statements are admissible only if offered against him -- otherwise, they fall within the scope of the rule against hearsay.  Fed. R. Evid. 801(d)(2)(A); United States v. Fernandez, 839 F.2d 639, 640 (9th Cir. 1988).  The hearsay rule prohibits a defendant from obtaining the benefit of testifying without subjecting himself to cross-examination by placing his self-serving prior statements before the jury through other witnesses. Fed. R. Evid. 801(c); Fernandez, 839 F.2d at 640.

Other than defendant's statements that the parties have agreed to admit (see Dkt. No. 52), defendant may not introduce any of his own out-of-court statements, including through the testimony of another witness, counsel's opening statement, or counsel's argument. Any such attempt would be impermissible because those statements are hearsay.

**G.    Defendant's State Court Matter**

The parties have stipulated to exclude reference to defendant's pending California state case, charging him with felony assault and robbery.  (See Dkt. No. 53.)  The stipulation provides that, if, during trial, the government contends that the defense has opened the door to reference to the state mater or defendant's underlying

conduct in the matter, the government shall raise the issue with the Court outside the presence of the jury prior to introducing or eliciting any reference to the matter.  Such evidence may become relevant if defendant and/or another witness testifies regarding defendant's character and/or defendant's truthfulness.  See Fed. Rules Evid. 405, 608.

### H.    Cross-Examination of Defendant

A defendant who testifies at trial may be cross-examined as to all matters reasonably related to the issues he or she puts in dispute during direct examination.  "A defendant has no right to avoid cross-examination on matters which call into question his claim of innocence." United States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981).

Under the doctrine of impeachment by contradiction, which emanates from Federal Rule of Evidence 607, a party may admit relevant, extrinsic evidence to impeach specific errors or falsehoods in a witness's direct testimony. United States v. Castillo, 181 F.3d 1129, 1132-33 (9th Cir. 1999).  The occasion to impeach by contradiction may arise when, on direct examination, a defendant broadly disclaims misconduct, "open[ing] the door for extrinsic evidence to contradict even though the contradictory evidence is otherwise inadmissible under Rules 404 and 608(b) and is, thus, collateral." Id. (quoting 2A Charles A. Wright, et al., Fed. Practice and Procedure, § 6119 at 116-17 (1993)).

Should defendant elect to testify and broadly disclaim misconduct, the government should be allowed to cross examine defendant with extrinsic evidence of defendant's prior arrests. See, e.g., United States v. Weicks, 362 F. App'x 844, 849-50 (9th Cir.

1  2010) (defendant's prior arrests for illegal possession of firearms

2  were admissible for impeachment after defendant testified and

3  portrayed himself as someone who avoided being around firearms);

4  United States v. David, 337 F. App'x 639, 640 (9th Cir. 2009)

5  (holding that defendant's "blanket statement . . . that he 'would

6  have never told anyone to falsify a document' opened the door to

7  impeachment with details regarding a prior conviction involving the

8  falsification of receipts").  And if defendant attempts to portray

9  himself as generally law-abiding, the government should be permitted

10  to present evidence directly contradicting such statements.

11  Cf. United States v. Antonakeas, 255 F.3d 714, 724-25 (9th Cir. 2001)

12  (introducing extrinsic evidence testimony about defendant's cocaine

13  sales was not abuse of discretion where defendant "opened the door"

14  to rebuttal testimony by holding himself out as legitimate

15  professional and disavowing any involvement with drugs).

16      **I.   Use of Exhibits During Opening Statement**

17          Exhibits may be used by the government in the opening statement,

18  and so long as the opening statement "avoids references to matters

19  that cannot be proved or would be inadmissible, there can be no

20  error, much less prejudicial error."  United States v. De Peri, 77826

21  F.2d 963, 979 (3d Cir. 1985); see also United States v. Rubino, 431

22  F.2d 284, 290 (6th Cir. 1970).  The government intends to identify

23  the photographs, audio, and video that it will use in its opening

24  statement to the defense prior to trial.

25      **J.   Defendant Seeking to Call Jose Arambula as a Defense**
          **Witness**

26

27          On February 2, 2023, defendant filed a motion for a writ of

28  habeas corpus to compel the testimony of Jose Arambula, who is a

14

defendant charged with fentanyl distribution in a separate case.
(Dkt. No. 55.)  Snapchat messages show that N.Y. sent messages to
Arambula seeking "oxy" pills in the hours before N.Y.'s death.  The
government, however, has not found any evidence that Arambula
delivered drugs to the victim that night, or ever.  Rather, the
totality of the conversation between N.Y. and Arambula indicate that
no drug transaction occurred:

| From | To | Message | Time |
|------|------|---------|------|
| N.Y. | Arambula | Yoo | 5/14/2020 10:17:08 PM |
| N.Y. | Arambula | U hv oxys? | 5/14/2020 10:17:12 PM |
| Arambula | N.Y. | Yea | 5/14/2020 10:17:24 PM |
| N.Y. | Arambula | What mh | 5/14/2020 10:17:41 PM |
| N.Y. | Arambula | Mg | 5/14/2020 10:17:42 PM |
| Arambula | N.Y. | M30s | 5/14/2020 10:18:21 PM |
| N.Y. | Arambula | Can you deliver to pv | 5/14/2020 10:18:37 PM |
| N.Y. | Arambula | For 5 | 5/14/2020 10:18:39 PM |
| N.Y. | Arambula | Do you think I could do 150 and not die | 5/14/2020 10:32:00 PM |
| N.Y. | Arambula | ? | 5/14/2020 10:54:08 PM |
| Arambula | N.Y. | Wym?? | 5/15/2020 3:19:00 AM |

| N.Y. | Arambula | Bro | 5/15/2020 3:19:06 AM |
|------|----------|-----|----------------------|
| N.Y. | Arambula | U can chew and snort oxys right | 5/15/2020 3:19:33 AM |
| Arambula | N.Y. | [Read notice] | 5/15/2020 3:23:48 AM |
| N.Y. | Arambula | Fasho can you deliver tmrw | 5/15/20202 3:25:00 AM |
| Arambula | N.Y. | Yessir | 5/15/2020 3:30:17 AM |
| Arambula | N.Y. | What you need? | 5/15/2020 3:30:24 AM |
| N.Y. | Arambula | To pv? | 5/15/2020 3:30:26 AM |
| N.Y. | Arambula | Oxys | 5/15/2020 3:30:35 AM |
| Arambula | N.Y. | How many you need | 5/15/2020 3:31:12 AM |
| N.Y. | Arambula | How high do you think I can go | 5/15/2020 3:31:46 AM |
| N.Y. | Arambula | Mg wise | 5/15/2020 3:31:51 AM |
| N.Y. | Arambula | W out dying | 5/15/2020 3:32:03 AM |
| N.Y. | Arambula | Cuz I did 150 like two hours ago | 5/15/2020 3:32:30 AM |

16

| N.Y. | Arambula | N im chillin | 5/15/2020 3:32:35 AM |
|------|----------|--------------|----------------------|
| Arambula | N.Y. | Do half of a half so just a quarter of the pill bc they are strong if not half will be good but Fs don't take more than one | 5/15/2020 4:03:10 AM |
| N.Y. | Arambula | 30 mg? | 5/15/2020 4:52:29 AM |
| Arambula | N.Y. | Yea | 5/15/2020 4:59:35 AM |
| N.Y. | Arambula | I just did 5 30s tho | 5/15/2020 5:00:10 AM |
| Arambula | N.Y. | *Voice call* | 5/15/2020 12:10:15 PM |
| Arambula | N.Y. | That's to much bro | 5/15/2020 12:10:29 PM |

The government does not object to the defense's request for a writ.  However, the government does object to Arambula testifying at trial should the Court conclude that Arambula may assert his constitutional right to remain silent at trial.  This is because "[i]t is well established that a criminal defendant may not call a witness if that witness . . . 'will merely be invoking his Fifth Amendment right not to testify.'"  See <u>United States v. Klinger</u>, 128

17

F.3d 705, 709 (9th Cir. 1997) (quoting <u>United States v. Espinoza</u>, 578 F.2d 224, 228 (9th Cir.1978).  Thus, should the Court conclude that Mr. Arambula "could properly assert his Fifth Amendment rights with respect to all of [defendant Wilson's] proposed questions," --- which the government contends is the case here --- the government will move to preclude the defense from calling Mr. Arambula "to the stand for the sole purpose of invoking the Fifth Amendment before the jury." <u>United States v. Sapp</u>, 721 F. App'x 698, 699 (9th Cir. 2018).

Unless the Court orders a different briefing schedule, the government intends to file its full response to defendant's motion by Wednesday, February 8, 2023 at noon.

## K.   Reciprocal Discovery

Defendant has produced reciprocal discovery regarding the anticipated expert forensic testimony of Dr. Iaian McIntyre.  To the extent defendant attempts to introduce or use documents at trial that have not been previously produced, or to use undisclosed experts, the government reserves the right to seek to preclude their use.  <u>See</u> Fed. R. Crim. P. 16(d)(2) ("[T]he court may . . . prohibit the party from introducing evidence not disclosed."); <u>see also</u> <u>Taylor v. Illinois</u>, 484 U.S. 400, 415 (1988) (defendant's failure to comply with, or object to, government's discovery requests before trial justified exclusion of unproduced evidence).

## L.   Affirmative Defenses

Defendant has not given notice of an intent to rely on any defense of mental incapacity, duress, entrapment, or alibi. Therefore, to the extent defendant may attempt to rely on any such defense, the government reserves the right to object and to seek to have defendant precluded from asserting such a defense.

18

**V.    CONCLUSION**

The government respectfully requests permission to file supplemental trial memoranda if necessary.